TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 1
DATE: 01/19/2021 02:28:02 PM

UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES | : | |
| vs. | : | CRIMINAL NO. 1:16-CR-10096-PBS |
| SHAUN MILLER, | : | |
| Defendant | : | January 19, 2021 |
| | : | |

U.S. DISTRICT COURT
DISTRICT OF MASS.
2021 JAN 25 PM 1:41
FILED IN CLERKS OFFICE

EMERGENCY MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO THE FIRST STEP ACT

Shaun Miller, pro-se, respectfully moves the Court under Subsection 3582 (c)(1)(A)(i) to reduce his sentence and immediately release him to home confinement and a period of supervised release. This Court originally sentenced Mr. Miller, a non-violent offender, to a term of 90 months of imprisonment. Mr. Miller has now served nearly 60% of his statutory term.

Since Mr. Miller was sentenced, the unprecedented COVID-19 pandemic, which was not within the contemplation of the Court at sentencing, has ravaged the federal prison system, leading to 124 confirmed inmate deaths and over 14,000 confirmed inmate infections. COVID-19 now poses grave risks to Mr. Miller, who currently suffers from obesity. The Center for Disease Control ("CDC") and numerous medical studies have recognized that obesity is a critical risk factor which greatly increases the risk of serious, even life-threatening, complications from COVID-19. In a prison environment, where Mr. Miller is unable to practice social distancing or proper hygiene, Mr. Miller's risk for contracting COVID-19, and suffering severe complications, are greatly increased. This is particularly the case since Mr. Miller is currently designated to the cadre unit at the Metropolitan Detention Center in Brooklyn ("MDC"), where he is required to work in different units of the building, as well as outside the building, coming into contact with numerous inmates and staff members daily, increasing his points of potential exposure. The COVID-19 pandemic, coupled with Mr. Miller's increased risk of severe complications due to his health condition, establish extraordinary and compelling reasons warranting compassionate release.

Mr. Miller's exceptional rehabilitation further warrants compassionate release. During almost four and a half years of incarceration, Mr. Miller has been a model prisoner and has taken great strides to better

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 2
DATE: 01/18/2021 12:44:50 PM

himself, taking nearly every class available to him, and even enrolling in a number of correspondence courses for evangelism/Bible teaching. The Second Circuit has recently ruled that this kind of extraordinary rehabilitation is highly relevant to a motion for compassionate release when combined with other factors. See United States v. Zullo, Case No. 19-3218-cr (2d Cir. Sept. 25, 2020). Because there are abundant extraordinary and compelling reasons warranting compassionate release, Mr. Miller respectfully requests that this Court grant his motion or schedule a hearing on the motion as soon as possible.

I.   Procedural History and Background

On October 20, 2017, this Court sentenced Mr. Miller to a term of 90 months in prison for two non-violent, but serious offenses: possession with intent to distribute and distribution of less than 100 grams of heroin, and possession of a firearm by a convicted felon, in violation of 21 U.S.C. Subsection 841(A)(1) and 18 U.S.C. Subsection 922(G)(1). See Ex. 1, BOP Sentence Monitoring Computation Data Sheet.

Mr. Miller has served approximately 4 and a half years of that sentence, which equates to over one-half of his statutory term, and is eligible for release to home confinement on July 8, 2022. See Ex. 1. His projected release date is January 8, 2023. Id.

Mr. Miller filed an administrative relief request with MDC Brooklyn on or about December 17, 2020 seeking compassionate release and has not yet received a response. Given that over 30 days have passed since Mr. Miller filed his request, the Court can consider his request for compassionate release, whereas the First Step Act provides, in applicable part, that:

(1)   in any case-

(A)   the court, upon...motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment... after considering the factors set forth in Section 3553 (a) to the extent that they are applicable, if it finds that-

(i) extraordinary and compelling reasons warrant such a reduction; ...

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. 18 U.S.C. Subsection 3582(c)(1)(A)(i).

In this case, Mr. Miller has "fully exhausted all administrative rights" relative to his request for compassionate release. He has submitted a request for compassionate release, and that request has gone

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----------------------------------------------------------------------------------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 3
DATE: 01/19/2021 02:30:10 PM

unanswered. Accordingly, he has exhausted all administrative rights within the Bureau of Prisons, and his request for compassionate release is ripe for review by this Court.

II. Mr. Miller's medical condition, coupled with the conditions of his confinement, place him at great risk of contracting COVID-19, and suffering severe complications

   A. Mr. Miller's medical condition puts him at high risk of severe illness or death from COVID-19.

      i. Mr. Miller is medically obese.

At the time of his sentencing, Mr. Miller had no known medical issues and was a healthy 31-year old man. He was 5 feet, ten inches tall and weighed 164 pounds. Since the pandemic, Mr. Miller has been forced to suffer frequent "lock-down" periods, during which he is confined to his cell for durations of up to 24 hours a day, sometimes lasting for up to weeks, if not months at a time. As a result, Mr. Miller has now gained a tremendous amount of weight.

Mr. Miller first noticed that he was beginning to gain a lot of weight in October of 2020. He weighed himself utilizing the unit's scale that is available to him in his living quarters and was 204 lbs. As the weeks continued, Mr. Miller noticed an even greater increase in his weight. In early December of 2020, Mr. Miller weighed himself once more utilizing the scale that is available to him in his unit. This time, Mr. Miller weighed 230 lbs.

In most BOP facilities across the country, an inmate can access medical staff every morning at 7am, Monday through Friday, by simply walking into the medical unit during "sick call". At that time the sick or injured inmate may receive immediate medical attention. Unfortunately, MDC Brooklyn has a different policy. At the MDC, inmates who are in need of medical attention must file a request electronically to medical staff. Inmates are then placed on a "waiting list". This process can take weeks, if not months, before a sick or injured inmate might receive the proper care needed.

When Mr. Miller noticed that his weight was dramatically increasing on December 8, 2020, he immediately wrote a request to medical staff identifying his specific problem. See Ex. 2. Approximately 15 days passed and Mr. Miller had still not been seen by a doctor. On December 23, 2020, Mr. Miller filed another request to be seen by medical staff, also explaining that he was experiencing frequent headaches and numbness of hands. See Ex. 3. On January 7, 2021, after approximately 30 days had passed since his initial request for medical attention, Mr. Miller filed a third request to be seen by a doctor. See Ex. 4.

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----------------------------------------------------------------------------------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 4
DATE: 01/19/2021 02:36:13 PM

Because doctors at MDC Brooklyn failed to respond to any of his requests for medical attention, Mr. Miller was left with no other option but to take the necessary steps of his own to investigate his condition. He obtained a Body Mass Index ("BMI") chart through his sister, Brianna Miller, who is currently employed as a Medical Assistant in the State of Massachusetts. See Ex. 5. According to the chart, Mr. Miller has a BMI score of 33 kg/m2, as he is 5' 10" tall and weighs 230 lbs. See Ex. 5. This undoubtedly places Mr. Miller in the category of being medically obese. Id.

    ii. With a serious comorbidity, Mr. Miller has a much greater chance of becoming seriously ill or dying from COVID-19.

The Center for Disease Control (CDC) has indicated that obesity increases one's risk of severe illness from COVID-19. See Ex. 6. Moreover, the CDC explains that obesity increases one's risk for hospitalization threefold. See Ex. 7. (Note- the chart in Ex. 7 was obtained from https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html (last accessed Jan. 11, 2021).

Medical studies have confirmed this finding as well. See Katelyn Newman, Study: High Blood Pressure, Obesity are Most Common Comorbidities in COVID-19 Patients, U.S. News and World Report, Apr. 22, 2020 (analyzing the results of a study of 5,700 patients hospitalized in the New York area, noting that "[a]mong the 5,350 patients who were presented with a comorbid condition,...41.7% were obese"); Jonathan Cunningham, Clinical Outcomes in Young US Adults Hospitalized With COVID-19, JAMA Internal Medicine, Sept. 9, 2020 (analyzing the outcomes of 3222 young adults, age 18-34 years old, hospitalized with COVID-19, and finding that 36.8% had obesity).

Further, patients who do not die from serious cases of COVID-19 often face prolonged recovery periods, including extensive rehabilitation from heart and neurologic damage and loss of respiratory capacity, all of which would likely render Mr. Miller unable to independently function within the prison, if he were to contract the virus. See Jennifer Couzin-Frankel, Science, From 'brain fog' to heart damage, COVID-19's lingering problems alarm scientists, July 31, 2020.

The CDC guidance and these research studies establish beyond dispute that Mr. Miller's obesity puts him at a much higher risk of severe illness, hospitalization, and death from COVID-19 than an average inmate, were he to contract the virus.

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

------------------------------------------------------------------------------------------------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 5
DATE: 01/18/2021 12:51:56 PM

    B.   Conditions at the MDC, and in particular, Mr. Miller's position in the cadre unit, create a high risk that he will contract COVID-19.

Mr. Miller's risk of contracting this virus is further elevated by the particular circumstances of his confinement at the MDC.

    i.  The conditions at the MDC are a breeding ground for the virus.

According to the BOP website, the MDC currently has 13 COVID-positive staff members, 11 COVID-positive inmates, 158 "recovered" inmates, and 62 "recovered" staff members. See www.bop.gov/coronavirus/ (last accessed January 11, 2021). Furthermore, in a lawsuit filed by at-risk prisoners against the MDC, Judge Kovner noted that petitioners had adduced evidence that "MDC officials are falling short of the CDC's guidance in several respects: While CDC guidance calls for inmates experiencing possible COVID-19 symptoms to be evaluated 'at the first sign of symptoms,' ... so that potentially infected inmates can be placed in isolation 'immediately once symptoms appear,' ... evidence at the hearing indicates that MDC officials may take days or sometimes weeks to respond to requests for medical attention that describe such symptoms." Chunn v. Edge, No. 20CV1590RPKRLM, 2020 WL 3055669, at *26 (E.D.N.Y. June 9, 2020). In addition, the Judge found that "while CDC guidelines call for isolating individuals who have symptoms of COVID-19, ... MDC officials appear to have isolated only a fraction of inmates displaying such symptoms." Id. Although the Court in that matter found that petitioners did not ultimately meet the stringent test for a preliminary injunction and that lawsuit was dismissed after the MDC released the petitioners in the action, it brought to light very troubling reports of how MDC officials have been handling the pandemic.

Similarly, several lawmakers issued a statement on May 15, 2020 expressing concerns of inadequate handling of COVID-19 at the MDC, stating:

> We've also heard directly from union officials representing MDC workers about conditions at the facility. They've expressed clearly to the Court and media that: staff are performing their duties without adequate Personal Protective Equipment; inmates are being distributed inadequate, flimsy facial masks that quickly deteriorate; sick staff continue reporting to work specifically because of BOP administrative policies; and inmates at MDC are not being tested in a manner sufficient to slow - let alone stop - the spread of coronavirus.

Ex. 8, Rep. Nydia Velasquez Press Release, NYC Elected Officials Statement Regarding Metropolitan Detention Center Brooklyn.

Due to these types of concerns, judges have granted compassionate release motions to inmates housed at the MDC, noting that although the BOP and the MDC staff seems to be doing what they can with the limited

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 6
DATE: 01/18/2021 12:52:27 PM

resources they have available, their response to the pandemic "falls short in key respects and cannot eliminate the heightened risks inherent in a carceral setting." United States v. Rodriguez, No. 17-CR-157 (VEC), 2020 WL 3051443, at *2-3 (S.D.N.Y. June 8, 2020) (granting compassionate release to inmate from the MDC and noting that the MDC has only provided 1 disposable mask per week to each inmate, inmates are not provided with N95 masks, and the MDC is not testing asymptomatic inmates due to a shortage of testing kits); See also United States v. Perez, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020) (ordering release of prisoner from the MDC); United States v. Sanchez, No. 18-CR-00140-VLB-11, 2020 WL 1933815, at*7 (D.Conn. Apr. 22, 2020) (ordering release of prisoner from the MDC).

In addition, it is likely that the number of COVID-19 cases at the MDC will continue to grow, as the rates of COVID-19 cases in New York City, and in Brooklyn in particular, are on the rise. The New York Times reported on September 29, 2020 that "New York State on Monday reported a spike in its rate of new cases, including a rise in New York City" and that, "[o]fficials are particularly concerned about eight neighborhoods in Brooklyn and Queens... that have accounted for about one-fourth of New York City's new cases in the past two weeks, despite representing about 7 percent of the city's population." Ex. 9, N.Y.Times, N.Y.C.'s mayor announces an uptick in the city's positivity rate, as elementary schools open. Given that prison guards and other individuals who work at the MDC come in and out of the building daily, this rise in cases in the community surrounding the prison has already began to inevitably translate into a rise in cases inside the prison. See www.bop.gov/coronavirus/

ii. Mr. Miller's position at the MDC puts him at particular risk.

The risk for infection has been compounded for Mr. Miller because he has been assigned to the cadre unit at the MDC, which means that he performs services throughout the prison and comes into contact with many inmates and staff members on a daily basis, some whom appear to be sick and coughing, thereby increasing his risk of infection. Mr. Miller is also one of the privileged inmates who possesses a "gate pass", which calls for his services to be used for jobs outside of the prison as well. This places him at an even greater risk of infection from COVID-19, whereas he then enters directly into the community surrounding the MDC as his services are needed. Because of the nature of his assigned duties, Mr. Miller is unable to take precautionary measures recommended by the CDC to avoid the virus, including social distancing. He has been

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----------------------------------------------------------------------------------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 7
DATE: 01/18/2021 12:53:04 PM

. forced to ride on crowded elevators of up to eight people at one time, and even forced to collect trash as well as drop off commissary purchases to floors of the building that are under specific quarantine due to a positive presence of COVID-19 among inmates who reside there.

In addition, the medical team at the MDC is overwhelmed and unable to respond to prisoners who are ill. In the last few weeks, Mr. Miller has had frequent headaches and dizziness, and has had to submit multiple written requests for medical attention over a period of 30 days. See Exs. 2, 3 and 4. Mr. Miller has still not been seen by a doctor. He was recently informed that the MDC medical staff is completely overwhelmed by the number of prisoners in the quarantine units and so they have been unable to respond to prisoner's sick requests in the main part of the prison.

    iii. Prison conditions have led to unprecedented outbreaks and hundreds of prisoner deaths around the country.

Due to the inability of inmates like Mr. Miller to protect themselves through social distancing and proper hygiene, significant and deadly outbreaks of COVID-19 have developed at both federal and state prisons around the country. See Michael Balsamo, Over 70% of tested inmates in federal prisons have COVID-19, Apr. 29, 2020, AP News; Josiah Bates, Ohio Began Mass Testing Incarcerated People for COVID-19. The Results Paint a Bleak Picture for the U.S. Prison System, Time Magazine, Apr. 22, 2020 ("Mass testing at a state prison in Ohio has provided more evidence of just how quickly and easily the novel coronavirus can spread in correctional facilities. 2,011 people - or 78% of all inmates - have tested positive for COVID-19 at the Marion Correctional Institution in Marion County, Ohio, according to the Ohio Department of Rehabilitation & Corrections.") These outbreaks have resulted in at least 1,107 deaths of prisoners nationwide, as of September 22, 2020, and the number of inmate deaths continues to rise at alarming rates. See The Marshall Project, A State-by-State Look at Coronavirus in Prisons (reporting that, as of September 22, 2020, "at least 1,107 other prisoners have died of coronavirus-related causes" and that "[b]y Sept. 22, the total number of deaths had risen by 4 percent in a week"); BOP website, https://www.bop.gov/coronavirus/ (reporting on September 28, 2020 that there have been "124 federal inmate deaths and 2 BOP staff member deaths attributed to COVID-19 disease").

Given the conditions of confinement at prisons in general, the situation at the MDC in Brooklyn in particular, and Mr. Miller's exposure to a vast number of inmates and staff members at the MDC because of

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 8
DATE: 01/19/2021 02:30:52 PM

his position in the cadre unit, Mr. Miller submits that he is at very high risk for COVID-19.

III. "Extraordinary and compelling reasons" warrant a reduction in Mr. Miller's sentence.

A court may reduce a defendant's term of imprisonment pursuant to 18 U.S.C. Subsection 3582(c)(1)(A) after finding that "extraordinary and compelling reasons warrant such a reduction." A court's discretion to reduce a defendant's sentence under this statute is extremely "broad" and is not limited by the previously enacted United States Sentencing Guideline Subsection 1B1.13, Application Note 1(D), which applies to motions for compassionate release brought by the Bureau of Prisons. Subsection 1B1.13, Application Note 1 states that "extraordinary and compelling reasons" warranting a sentence reduction under 18 U.S.C. Subsection 3582(c)(1)(A) exist under certain specific circumstances. Subsection (D) is a catchall provision which provides that such reasons can exist when "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in Subdivisions (A) through (C)." This Application Note essentially allowed the Bureau of Prisons to be the sole arbiter of whether most reasons qualified as extraordinary and compelling. The Second Circuit, in United States v. Zullo, Case No. 19-3218-cr(2d Cir. Sept. 25, 2020), found that since the Sentencing Commission has not updated its guidance in the area since passage of the First Step Act, the First Step Act freed district courts to consider any potential extraordinary and compelling reasons that a defendant raises for compassionate release. See United States v. Zullo, Case No. 19-3218-cr(2d Cir. Sept. 25, 2020).

In fact, in a recent decision issued by the Second Circuit, United States v. Zullo, the court reversed a district court's denial of compassionate release for a defendant who had requested a sentence reduction under 18 U.S.C. Subsection 3582(c)(1)(A) based on his extensive rehabilitation, his young age at the time of the crime, and the fact that his sentence was extremely long, a 15 year mandatory minimum. Id. While the district court had considered itself to be constrained by the factors set forth in Application Note 1(D) when evaluating the defendant's motion for compassionate release, the Second Circuit held that: "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline Subsection 1B1.13, limits the district court's discretion." Id at 18.

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----------------------------------------------------------------------------------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 9
DATE: 01/18/2021 12:53:44 PM

.	The Second Circuit emphasized the district court's wide discretion in this area, noting that "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation...alone shall not be considered an extraordinary and compelling reason", citing to 28 U.S.C. Subsection 994(t). Id. at 19. The Court specifically noted, however, that Zullo was not relying on his rehabilitation alone and that "the sentencing court's statement about the injustice of his lengthy sentence might perhaps weigh in favor of a sentence reduction." Id. The Court also pointed out that these arguments "may also interact with the present coronavirus pandemic, which courts around the country, including in this circuit, have used as a justification for granting some sentence reduction motions." Id. at 20.

Here, Mr. Miller can demonstrate extraordinary and compelling reasons for a reduction in his sentence under 18 U.S.C. Subsection 3582(c)(1)(A), based on several factors, including: (1) his medical condition, which puts him at grave risk for severe illness or death should he contract COVID-19, which is a very real possibility in light of his position in the cadre unit at the MDC; (2) his exceptional rehabilitation since his incarceration; and (3) other relevant Subsection 3553(a) factors.

   A. Mr. Miller's medical condition, which puts him at increased risk of severe illness or death from COVID-19, is an extraordinary and compelling reason.

Mr. Miller can demonstrate extraordinary and compelling reasons for compassionate release based on the risk of COVID-19 infection to which he is exposed at the MDC and his obesity, which puts him at higher risk for severe illness or death from COVID-19 should he contract it. In recognition of the extraordinary threat that COVID-19 poses to at-risk inmates, other courts have found that inmates with comparable medical conditions demonstrated extraordinary and compelling reasons justifying compassionate release to home confinement. See e.g., United States v. Pappas, No. 17-CR-67 (LDH), 2020 WL 5658775, at *1 (E.D.N.Y. Sept. 23, 2020) (ordering release of inmate with severe obesity who had served 23 months of 60 month term of imprisonment); United States v. Delgado, No. 3:18-cr-17(VAB) -1, 2020 WL 2464685 at, *6 (D.Conn. Apr. 30, 2020) (ordering release of inmate with obesity and sleep apnea); United States v. Williams-Bethea, No. 18-CR-78 (AJN), 2020 WL 2848098, at *4 (S.D.N.Y. June 2, 2020) (ordering release of inmate with obesity and hypertension and noting that "the Defendant puts forward compelling and undisputed evidence that obesity is likewise a comorbidity for COVID-19, and that individuals who are severely obese...are significantly more likely to face serious risk from the virus."); United States v. Gross, No. 15-CR-769 (AJN), 2020 WL 1862251, at *4 (S.D.N.Y.

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 10
DATE: 01/18/2021 12:54:27 PM

. Apr. 14, 2020)(ordering release of inmate with obesity, hypertension and sleep apnea); United States v. Acoff, No. 3:09CR703 (MPS), 2020 WL 2781798, at *1(D. Conn. May 29, 2020)(ordering release of inmate with obesity and a heart condition); United States v. Jenkins, No. 99-CR-00439-JLK-1, 2020 WL 2466911, at *7 (D. Colo. May 8, 2020)(releasing inmate with obesity and other conditions and noting various medical studies that have linked obesity to severe illness and death from COVID-19); United States v. Williams, No. 19-CR-134-PWG, 2020 WL 3073320, at *4 (D. Md. June 10, 2020)(ordering release of inmate with obesity who has tested positive for COVID, noting that "judges in other circuits have found obesity as a contributing factor in analyzing an extraordinary and compelling reason for compassionate release during COVID-19" and collecting cases); United States v. White, No. 13-CR-20653-1, 2020 WL 2557077, at *1 (E.D. Mich. May 20, 2020) (ordering release of inmate with obesity and hypertension).

At bottom, these decisions recognize that, where an inmate's life might be threatened due to the confluence of their health conditions and the increased risk from COVID-19, compassionate release is warranted. In Mr. Miller's case, he is medically obese, which places him at risk for sever illness or death from COVID-19, he is at a facility where COVID-19 is highly present and the conditions are ripe for further spread of the virus, and he has been assigned to a job where he is required to circulate throughout the facility, even working outside of the facility, coming into contact with many inmates and staff members as a result. To avert a potentially deadly outcome here, Mr. Miller urges the Court to reduce his sentence to time served or to permit him to serve the remainder of his term on home confinement, which would allow him to practice social distancing and proper hygiene and protect himself in a manner that is impossible in a prison environment.

B. Mr. Miller's extraordinary rehabilitation since his incarceration weighs in favor of a sentence reduction here.

As the Second Circuit found in United States v. Zullo, Case No. 19-3218-cr, at *19 (2d Cir. Sept. 25, 2020), a defendant's rehabilitation since his incarceration is relevant to, and part of the mix of factors that a court can evaluate when deciding whether to grant a sentence reduction under 18 U.S.C. Subsection 3582 (c)(1)(A). Indeed, numerous courts evaluating compassionate release motions have concluded that a defendant's extensive rehabilitation, in combination with other factors, warranted a sentence reduction. See United States v. Torres, No. 87-CR-593 (SHS), 2020 WL 2815003, AT *6,9 (S.D.N.Y. June 1, 2020) (granting compassionate release to two inmates who had "undertaken extraordinary efforts to better

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 11
DATE: 01/18/2021 01:10:58 PM

themselves and their communities since their incarceration", by, among other things, completing "a plethora of courses, educational programs and life skills programs at the prisons"); United States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272, at *2 (S.D.Tex. June 24, 2019) (granting inmate compassionate release, in part, due to his degree of rehabilitation, including his educational achievements while in prison); United States v. Almontes, No. 3:05-CR-58 (SRU), 2020 WL 1812713, at *9 (D.Conn. Apr. 9, 2020) (granting compassionate release due to medical reasons and also because the defendant's "rehabilitation from his former life of crime has been total, and he has a supportive network of family ready to help him reintegrate into society.") Mr. Miller's extensive efforts to rehabilitate himself are likewise extraordinary. After sentencing, Mr. Miller was assigned to serve his time at the Low Security Correctional Institution (LSCI) at Allenwood, Pennsylvania. Upon his arrival at the LSCI, Mr. Miller quickly began working in the prison's kitchen. There, he washed dishes, cleaned, and prepared meals for the inmate population for nearly 20 months. During that time, Mr. Miller also completed a list of educational programs, including a number of trade classes at the facility. See Ex. 10, Program Review (Inmate Copy). Mr. Miller became an active member of the church while at LSCI-Allenwood, and, in an effort to even further his rehabilitation, he began taking correspondence courses for Bible teaching and evangelical training, all of which he successfully completed (17 in total) with nothing less than a 95% grade. See Ex. 11, Certificates of Completion.

Additionally, at the time of his sentencing, the Court recommended that Mr. Miller participate in the Residential Drug Abuse Program (RDAP). The Court advised Mr. Miller that the program would not only benefit him in regards to his drug and alcohol problem, but that he could also receive (per order of the BOP) a one-year reduction from his sentence, as well as up to 12 months of halfway house/home confinement time for the completion of said program. Unfortunately, Mr. Miller has since been denied this opportunity due to the fact that the Residential Drug Abuse Program currently considers Mr. Miller's crime of Felon in Possession of a Firearm to be a violent offense (although the BOP itself recognizes Mr. Miller as being a nonviolent offender). According to the Residential Drug Abuse Program (RDAP) policy, a violent offender is ineligible to receive any time off from his sentence for completion of the program. Now, this rule has ultimately disqualified Mr. Miller for the reductions that both he and this Court reasonably believed he would be receiving from his sentence for Residential Drug Abuse Program participation at the time of his sentencing. As discouraging as this news

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 12
DATE: 01/18/2021 01:13:24 PM

has been for Mr. Miller, he has refused to allow this "bump in the road" to keep him from seeking and receiving the treatment he so desperately needed for his addictions. Mr. Miller went on to complete not only one, but two drug treatment programs at the LSCI, the most recent being the Non-Residential Drug Abuse Program (NRDAP). See Ex. 12, NRDAP Certificate of Completion. Mr. Miller admits that he discovered something at the LSCI that he had never found during any of his previous terms of incarceration. Mr. Miller confesses that for the first time in his life he found hope. Mr. Miller maintained "perfect conduct" at LSCI-Allenwood for nearly 20 months, ultimately earning himself a transfer to a lower-security-level prison in July of 2019. Mr. Miller was then transferred to the cadre unit at MDC Brooklyn. After approximately 30 days, he was given the privilege of obtaining a "gate pass", which allows him to go in and out of the local community, if needed, for work-related purposes. Mr. Miller then began his duties at MDC Brooklyn as a sanitation worker, and after 7 months he eventually worked his way up to a position in the prison's Commissary Department, where he has now currently been employed for the past 10 months. Mr. Miller has completed a list of programs while at the MDC as well. His most recent accomplishment includes the completion of a trades course which allowed him to receive his forklift operator's license. See Ex. 13. In addition, Mr. Miller has also taken on numerous "volunteer jobs" at the prison, including painting, sweeping, mopping, and cleaning the facility. Just recently, in fact, Mr. Miller shoveled the snow and salted all of the sidewalks surrounding the prison. (Please note that there are neither any walls nor fences around the outer perimeter of MDC Brooklyn). This assignment further demonstrates the trust that the BOP has in Mr. Miller due to his exemplary behavior.

   C.  An evaluation of the remaining Subsection 3553(a) factors weigh in favor of a sentence reduction for Mr. Miller.

In evaluating motions for compassionate release, "[t]he court must also consider the factors set forth in 18 U.S.C. Subsection 3553(a)." United States v. Scparta, No. 18-CR-578 (AJN), 2020 WL 1910481, at *8 (S.D.N.Y. Apr. 20, 2020). Among the factors to be considered under 18 U.S.C. Subsection 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from future crimes of the defendant, and (4) the need to avoid unwarranted sentence

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 13
DATE: 01/18/2021 01:13:56 PM

disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. Subsection 3553(a). Here, the 3553(a) factors warrant a reduction of Mr. Miller's sentence.

While Mr. Miller's underlying crimes were very serious, Mr. Miller quickly pled guilty, accepted responsibility for his conduct, and has been trying to make amends ever since. Through availing himself of every available educational opportunity, he has also positioned himself to be a productive member of society with gainful employment in the future. Although Mr. Miller did have a criminal history prior to these offenses, he has no history of violence, his instant offenses were nonviolent, and he has never been deemed a danger to the community. Under the Subsection 3553(a) analysis, how the defendant "lived his life in other regards also matters." Scparta, 2020 WL 1910481 at *8. Prior to his arrest, Mr. Miller was actively involved in his young son's life and was an exemplary father. In fact, Mr. Miller was the only active parent to be involved in his son's life at that time. The mother of Mr. Miller's son, Jerrica Dossantos, had abandoned her duties as a mother early on in the boy's life, ultimately leaving Mr. Miller's aunt, Sharon Chandler, to be the legal guardian of the child. Although it was Ms. Chandler who had legal guardianship of his son, Mr. Miller still made the necessary efforts to be a part of his child's life. On Fridays and Sundays, Mr. Miller would take the 6-hour round-trip to and from Derry, NH (where Mr. Miller's son resided with Ms. Chandler), to pick up his son and drive him back to his home on Cape Cod for the weekends. The last four and a half years have been excruciating for Mr. Miller primarily because he has missed four and a half precious years of his young son's life. Given how close he is to his son, the four and a half years that he has spent in prison have been more than "adequate deterrence" to deter any future criminal conduct. See Subsection 3553(a)(2)(B).

Moreover, the time that Mr. Miller has served over the last two and a half years specifically, have been exceedingly difficult, in a way that could not have been anticipated at the time of sentencing. At the time of Mr. Miller's sentencing, the only hope that Mr. Miller had for his young son was the fact that the child's mother, Ms. Dossantos, had since returned back into the boy's life and was now assuming the role of a mother again. She was clean and sober from drugs and alcohol and frequently visiting with their child. Mr. Miller was also re-establishing a relationship with Ms. Dossantos at that time. Then, suddenly, on July 25, 2018, Mr. Miller called home to hear the devastating news that the mother of his child had unexpectedly committed suicide at the tender age of 29. See Ex. 14, Obituary of Jerrica Dossantos. This unforeseen tragedy has since affected Mr.

```
TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B
-----------------------------------------------------------------------------------

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 14
DATE: 01/18/2021 01:14:12 PM
```

.      Miller's son in the most unfortunate way. Whereas Mr. Miller's son was once a happy and healthy child, Mr. Miller's son now has to frequently meet with a child psychologist. The weight of his mother's suicidal death, combined with the present incarceration of his father, has inevitably brought an unbearable level of hurt, fear, stress, and anxiety to the boy's young, 8-year-old heart. Now, if Mr. Miller were to become seriously ill to the point of death from COVID-19 while at the MDC, his son will have been forced to suffer the tragic loss of both his mother and his father at such an impressionable age. To make matters worse, visits at the MDC have been cancelled since March 2020, meaning that Mr. Miller's entire family has been unable to see or touch him for over ten months now. The fact that Mr. Miller has been left with no other option but to sit back and watch his child suffer from a distance, knowing that there is absolutely nothing that Mr. Miller could do right now to ease his son's pain, has been the most sufficient deterrence to future criminal conduct that any inmate could possibly experience. Mr. Miller is more than determined to go home, be the father that his son needs him to be, and never commit a single crime ever again. Mr. Miller asks this Court to please note that over two-thirds of the individuals who were indicted with him have already served their custodial sentences and have been released from prison or transferred to residential reentry centers. Mr. Miller also asks this Court to note that Mr. Miller's ex-girlfriend and main co-defendant in this matter, Brooke Cotell, was released from prison in 2018, has since been indicted in this Court on new drug-distribution charges, and is currently on home confinement pending the outcomes of her new federal case as well as multiple violations of her three-year term of supervised release.

   Under all of the circumstances in this case, the Court should conclude that the time that Mr. Miller has already served is sufficient to satisfy the purposes of sentencing. The overriding factor under Subsection 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offenses along with Mr. Miller's criminal history both qualified Mr. Miller for the sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. Helling v. McKinney, 509 U.S. 25, 28 (1993); see also Wallis v. Baldwin, 70 F.3d 1074 (9th Cir. 1995) (applying Helling to "contagious diseases caused by overcrowding conditions"). The Subsection

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

---

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 15
DATE: 01/18/2021 01:14:33 PM

3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

The Eighth Amendment also guarantees inmates in BOP custody the right to adequate medical care for a serious medical need. See Farmer v. Brennan, 51 U.S. 825, 832 (1994); Estelle v. Gamble, 429 U.S. 97, 103-05 (1976). One court recently invoked the Eighth Amendment in granting a motion for compassionate release, noting that "a reduction of [defendant's] sentence will enable him to seek, from the doctors and hospitals of his choice, what may be better medical care than the BOP is obligated or able to provide, particularly given the very real threat that COVID-19 poses in the institutional environment." United States v. Williams, No. 3:04-CR-95-MRC-CJK, 2020 WL 1751545 (N.D. Fla. Apr. 1, 2020).

Finally, due to the COVID-19 pandemic, the history and characteristics of the defendant and the "need... to provide the defendant with needed ... medical care," Subsection 3553(a), now weigh heavily in favor of Mr. Miller's release, given the health risk that continued incarceration poses to him. See Scparta, 2020 WL 1910481, at *8.

IV.    Mr. Miller has a stable home to live in, if released to home detention, where he will be safer.

If released to home confinement, Mr. Miller would have a stable home in which to live with his sister, Brianna Miller, and her two young children in South Dennis, Massachusetts. He will be able to practice social distancing there and will be able to teach and supervise his niece and nephew who are currently attending school remotely. He will have access to health insurance through Ms. Miller, who is employed in the medical field, and will immediately be set up with an adequate primary healthcare physician. Mr. Miller also has a number of job opportunities lined up for him, including a possible career as a welder, that will help him to assist his aunt financially in the caring of his child. Moreover, if released from prison, Mr. Miller will be in a much better position to be able to provide the mental and emotional support that his young, suffering son so desperately needs right now. Accordingly, Mr. Miller's motion can and should be granted forthwith.

V.    Conclusion

For the foregoing reasons, Mr. Miller respectfully requests that the Court modify his sentence under 18 U.S.C. Subsection 3582(c)(1)(A)(i) and release him to home confinement or hold a hearing as soon as possible. Should the Court wish to hold a hearing, Mr. Miller waves his appearance and asks that he be allowed to appear telephonically.

TRULINCS 99741038 - MILLER, SHAUN - Unit: BRO-D-B

----

FROM: 99741038
TO: Miller, Ashley
SUBJECT: page 16
DATE: 01/19/2021 02:29:38 PM

.

Dated: January 19, 2021
Brooklyn, NY

Respectfully Submitted,

/s/ Shaun Miller

Shaun Miller, Pro Se
Reg. No. 99741-038
Metropolitan Dentention Center
80 29th Street
Brooklyn, NY 11232